# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROGER HALL, et al.,                         :

       Plaintiffs,                    :
                        :

      v.                              :     C. A. No. 04-0814 (RCl)
             :

CENTRAL INTELLIGENCE AGENCY, :
                        :

       Defendant                    :

## SECOND RENEWED CROSS-MOTION FOR FOR SUMMARY JUDGMENT OF PLAINTIFS ROGER HALL AND STUDIES SOLUTIONS RESULTS, INC. AND FOR CERTAIN OTHER RELIEF, INCLDUING IN CAMERA INSPECTION, DISCCOVERY AND APPOINTMENT OF A SPECIAL MASTER

P=Plaintiffs, Roger Hall and Studies Solutions Results, Inc.,  moves this Court for summary judgment and other relief pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Hall and the SSRI also move the Court discovery,icamera inspection and appointment of a special master.

    A Memorandum of Points and Authorities in support of these motions and in opposition to defendant's second renewed motion for partial summary judgment, a proposed order, a statement of material facts not in dispute are submitted in support of this motion.  Also submitted in support of this motion are the 2016 Declaration of Roger Hall and the  Declaration of Carol Hrdlicka,

                    Respectfully submitted,


                        _____
                        James H. Lesar #11413

930 Wayne Ave.
Unit 1111
Silver Spring, MD 20910
Phone:  (301) 328-5920

Counsel for Plaintiffs Roger Hall
and SSRI, Inc.

October 21, 2009

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROGER HALL, et al.,        :

       Plaintiffs,        :

       v.        :    Civil Action No. 04-0814 (RCL)

CENTRAL INTELLIGENCE        :
       AGENCY

       Defendant        :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S SECOND RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND OTHER RELIEF AND IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

Defendant Central Intelligence Agency ("CIA") has once again moved for summary judgment. It claims that it has conducted adequate searches to locate and identify all of the responsive records sought by plaintiffs, that it has successfully accomplished this, and that it has released all non-exempt records and portions of such records.

The search involved a quest to locate records pertaining missing POWs. Hall requested records on all Prisoners of War ("POWs") and those Missing in Action ("MIAs"), including those on the Primary Next of Kin ("PNOK") list, which the CIA places at 1,711 names. Their identities and basic identifying information about them is known. Their disappearance has been reported by fellow soldiers, friends, and family. Many agencies and components of the U.S.

Government's military and intelligence components have made concerted efforts to locate and identify them over the past half century. Given all this, it seems unreasonable on its face that records pertaining to only a tiny percentage of these persons have been located and retrieved to date. Indeed, it is stunning that the CIA reports that a search of its Agency Archives and Research Center ("AARC") produced records on only 11 of the 1,711 names on the PNOK list. This glaring discrepancy between what is known and what has been obtained indicates that the searches conducted as a result of pressure from plaintiffs and this Court's instructions, although they have been productive in some measure, have nonetheless been deeply flawed.

Many of the inadequacies in the searches conducted to date are documented in the voluminous 2016 Declaration of Roger Hall ("Hall 2016 Decl.") which is submitted in support of this motion. In order to come to grips with demonstrated inadequacies in the searches done to date, plaintiff contend that one or more of the following actions is necessary: (1) in camera inspection, (2) discovery, and (3) appointment of a special master. Only the employment of these measures will enable plaintiffs to adequately probe nature and methodology of the CIA's searches and its capacity and willingness to locate responsive records.

With respect to exemption claims, the disparity between what the CIA claims and reality is also glaring. After half a century, the CIA is till trumping up claims that serious damage to national security and personal privacy override the profound public interest in disclosure. The credibility of the CIA's Vaughn indices is of course critical to acceptance of them. Once again, the claims seem to be highly implausible on their face.

The information at stake is concededly at least 25 years old and subject to automatic declassification under a steeper than normal review standard. Most of the information is more than 50 years old and is subject to automatic declassification under an extremely difficult standard of review. Yet the CIA's declarant ratifies the withholding of such allegedly "SECRET" or "TOP SECRET" information. Given the passage of time and the profound tilt of President Obama's Executive Order 13526 towards disclosure of ancient records, this claim is inherently dubious. It is made more so by the fact that while the CIA's declarant makes some statements on the basis of personal knowledge, other information, and perhaps the CIA's Vaughn indices themselves, are based on unspecified information "made available to me in my official capacity." Declaration of Antoinette B. Shiner ("Shiner Decl."), ¶ 6. This raises the spectre that such information may be hearsay or double hearsay and provided to Shiner by someone not qualified to make the determinations which Shiner's declaration endorses. The Shiner Declaration, or parts of it, may in effect be something akin to a "robo declaration."

In this regard, whatever credibility Shiner may have is severely undercut by her representations on a couple of documents possessing information that she declares must be withheld in the interest of privacy.

For example, she declares that Exemption 6 protects the privacy of the signature of Samuel R. Berger, who she briefly describes as Assistant to the President for National security Affairs. See Item 6 of Shiner's Exhibit B, the Released in Part ("RIP") Vaughn index. She says it would be a clearly unwarranted invasion of his personal privacy to reveal his signature. Berger is dead. Second, he was convicted of removing and destroying classified records from the National Archives. Third, his signature is on court

documents and public records he had to sign as part of his high position as assistant to the President.  Shiner is a high level CIA official with experience in CIA operations.  It seems very unlikely that she could have personally read this description and approved it. It seems much more likely that someone without her education and experience drafted this description.  In any event, whichever is the case, it reduces her credibility considerably.

In a second instance, Item 69 of the RIP index deletes the signature of United States Senator.  Again, this is done solely on privacy grounds under Exemption 6.  Again, it is difficult to believe that Shiner could have personally reviewed this information and signed off on the exemption claim.  Some nameless aide must have done so.  U.S. Senators send thousands of pieces of mail every year to each of their constituents, including signed letters soliciting or acknowledging receipt of campaign contributions.

There is no evidence in Item 69's index evaluating privacy versus public interests. This is a necessary element of an exemption 6 determination.  Most importantly, the letter of the Senator written by the Senator over his signature is not a private communication on his behalf, it is a communication he makes on behalf of the public in the performance of his job.  This weighs heavily on the side of disclosure in regard to an exemption claim that is already maximally tilted towards disclosure.  Yet the CIA wants to withhold it.

The CIA's credibility on its exemption claims is nil.  The validity of all of Shirer's claims in support of the CIA's motion for summary judgment is too tarnished to allow any part of it to be sustained.

ARGUMENT

## I.  THE CENTRAL INTELLIGENCE AGENCY HAS NOT SHOWN IT IS ENTITLED TO SUMMARY JUDGMENT

### A.  Summary Judgment Standard

The Freedom of Information Act ("FOIA") "requires federal agencies to make federal agency records available to the public subject to nine exemptions for categories of material," Milner v. Dept of Navy, 562 U,S. 562, 565 (2011)("Milner"). Ultimately, "disclosure, not secrecy, is the dominant objective of the act." Dept of Air Force v. Rose "Rose"), 425 U.S. 352,361 (1976). "For this reason, the 'exemptions are explicitly made exclusive . . . and must be 'narrowly construed.'" Id. at at 265 (citations omitted).

Agency actions under the FOIA are subject to de nova review. 5 U.S.C. § 552(a)(4)(B). "This requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested. . . are exempt from disclosure under the FOIA.'" MultiAg Media, LLC v. Dept. of Agriculture, 515 F.3d 1224, 1227 (D.C.Cir.2008) (citations omitted).

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Hall v C.I.A, 668 F.Supp.2d 172,179 (D.D.C. 2009)("Hall 2009"), citing Fed.R.Civ.P. 56(c). A District Court may award summary judgment "solely on the information provided in affidavits or declarations that describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith,'" Id., quoting Military Audit Project v. Casey ("Military Audit"), 656 F.2d 724,738 (D.C.Cir.l981).

.

B. <u>Vaughn Index Standard</u>

As noted in <u>King v. United States department of Justice</u>, 830 F,2d 210,218 (D C.

Cir. 1987) " [t]he significance of agency affidavits in a FOIA case cannot be

underestimated." The reason for this is that ordinarily the agency alone possesses kno

wledge of the precise content of documents withheld. Thus, "the FOIA requester and the

court both must rely upon its representations for an understanding of the material sought

to be protected," <u>Id</u>. The agency's asseverations are critical because "'[t]his lack of

knowledge by the party see[k]ing disclosure seriously distorts the traditional adversary

nature of our legal system's form of dispute resolution,' with the result that '[a]n appellate

court, like the trial court, is completely without the controverting illumination that would

ordinarily accompany a lower court's factual determination.'" <u>Id</u>., quoting <u>Vaughn v.

Rosen</u>,

484 F.2d 830, 824-825 (D.C.Cir. 1973). As <u>King</u> also stated:

> Specificity is the defining requirement of the
> <u>Vaughn</u> index and affidavit; affidavits cannot
> support summary judgment if they are "conclusory,
> merely reciting statutory standards or sweeping."
> To accept an inadequately supported exemption
> claim "would constitute an abandonment of the trial
> court's obligation under the FOIA to conduct a <u>de
> nova</u> review.

<u>Id</u>., at 219 (citations omitted).

This index "must describe each document or portion thereof withheld, and for

each withholding it must discuss the consequences of disclosing the sought after

information." <u>Id</u>, at 223-224 (emphasis in original). "Furthermore, a reproduction of the

redacted documents can only show the court the context from which an item has been

deleted, and context may or may not assist the court in assessing the character of the

excised material and the grounds for its deletion." Id. at 221. Footnote 90 to this passage

sets forth examples of the kinds of information that may heed to be considered in making

a determination as to whether an agency has carried its burden to show that information is

substantively classified:

> Contextual information cannot, for instance,
> answer questions of the following order. Is an
> intelligence source whose name has been excised
> still alive? Has that source been otherwise
> identified in the decades since the report
> was filed? Would information deleted on the
> theory that it might identify a source still do so
> forty years after the fact? Is a particular intelligence
> method or activity still in use? If not, what concerns
> warrant continuing protection for information on
> intelligence methods and activities from the 1940's?
> See text infra at notes 124-135.

King also made clear that courts must be wary of the categorization of exemption

claims. It laid down specific instructions for evaluating such claims:

> Categorical description of redacted material
> coupled with categorical indication of antici-
> pated consequences of disclosure is clearly
> inadequate. To support its Exemption 1 claims
> the agency affidavits must for each redacted
> document or portion thereof, identify the docu-
> ment, by type and location in the body of
> documents requested; (2) note that Exemption
> 1 is claimed; (3) describe the document withheld
> or any redacted portion thereof, disclosing as
> much information as possible without thwarting
> the exemption's purpose; explain how this
> information falls within one or more of the categories
> of information authorized by the governing executive
> order, and (5) explain how disclosure of the material
> in question would cause the requisite degree of harm
> to the national security.

Id. at 224 (footnote omitted).

As will be argued below, the CIA fails to shoulder its burden under the standards set forth above.

### C. All Nonexempt Segregable Portions Must Be Disclosed

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "Accord-ingly, 'non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions.'" Hall 2009, 668 F.Supp.2d 172, 194, quoting Krikorian v. Dep't of State, 984 F.2d 461, 466 (D.C.Cir. 1993) (quoting Mead Data, 566 F.2d at 260). "The agency bears the burden of demonstrating that withheld documents contain no reasonably segregable factual information, see Army Times Pub. Co. v. Dep't of Air Force, 998 F.2d 1067, 1068 (D.C.Cir.1993); Mead Data, 566 F.2d at 260, and must do so with 'reasonable specificity,' Armstrong, 97 F.3d at 578 (citing Quinon v. FBI, 86 F.3d 1222, 1227 (D.C.Cir.1996))." Id.

Hall noted that the District Court "has an affirmative duty to consider whether an agency has released all reasonably segregable information, Morley, 508 F.3d at 1123, and can do so only when the agency has correlated each exemption it claims with the particular portion of the document to which the exemption applies, Shiller, 964 F.2d at 1209-10 (citing Schwartz v. IRS, 511.F.2d 1303, 1306 (D.C.Cir. 1975); King v. US Dep't of Justice, 830 F.2d 210, 224 (D.C.Cir.1987))." Id.

In Hall 2009 Judge Kennedy found that the CIA had not provided sufficient information for the Court review its compliance with segregability requirement. He

concluded that the CIA's <u>Vaughn</u> index "must include more information about the segregability of documents. . . ." <u>id.</u>, stating that this required

> "specify[ing] in detail which portions of the document are disclosable and which are allegedly exempt," . . . mak[ing] specific findings for each document withheld[,] . . . and "correlat[ing] claimed exemptions with particular passages." <u>Id</u>. (quoting <u>Schiller</u>, 964 F.2d at 1209, 1210).

As will be shown below, the CIA still fails to show that it has disclosed all non-exempt segregable portions of the materials at issue.

D. <u>Analysis of CIA's Withheld-in-Full Vaughn Index</u>

The CIA has submitted two separate <u>Vaughn</u> indices; the first, Exhibit B to the Shirer Declaration, lists documents Released in Part ("RIP"); the second, Exhibit C to the Shirer Decl., is comprised of documents "Denied in Full" ("DIF"). This bifurcation is, however, somewhat misleading, as many RIP documents contain many pages, and even many documents, which are withheld in their entirety. For the moment, however, Hall considers only those records the CIA has included in its DIF index.

It is obvious that that the DIF index is insufficiently detailed to meet the requirements of a <u>Vaughn</u> index. Of the 48 numbered items which comprise the DIF index, seven contain more than 10 pages: Item 6 (58 pages); Item 20 (16 pages); Item 21 (11 pages); Item 23 (15 pages); Item 29 (20 pages); Item 31 (18 pages); Item 36 (12 pages).

Item 6 is described as a 58-page "document" dated October 8, 1992, which is a "package of 20 CIA documents" a congressional committee requested for its review. The claim is that this "package" is protected under four different exemption claims,

Exemption 1,  Exemption 3 based on the CIA Act, Exemption 3 based on the NSA Act, and Exemption 5.  This description raises several serious problems.  The first is the use of the date of the "package" conceals the dates of the 20 CIA documents and the information in them.  These dates are critical information.  Shiner states that the information at issue is more than 25-years old.  This is, of course, not true if the dates she gives are accurate as to the DIF records.  Only two of the 48 DIF items are dated before 1992, which is less than 25 years ago.  Whether the documents and the information in them are more than 50 years old or just more than 25 years old is essential to determining whether the review standard is set by § 3.3(b) or § 3.3(h) of E.O. 13526.  The dates of the documents are significant information for other reasons.

   The dates of documents indicate how many pages there are for each of the 20 documents.  This, together with the page numbers on each of the documents permits an evaluation of whether only certain pages of a document have been provided or whether the entire document was released  Apparently, the CIA's claim is that both the dates and page numbers are withheld under Exemption 1 and the NSA Act Exemption 3 claim, each of which is asserted to apply to the entire package.  This is a clear overreach of the application of either of these exemption claims, whether automatic declassification applies after 25 years or  50 years.

   These documents may also contain form numbers, administrative markings, file numbers, classification markings, and distribution lists.  The CIA has submitted no information indicating that this information would be exempt under a proper segregability analysis of any of the exemptions claimed.

It may also be that it is withholding file numbers and declassification markings and other such information under Exemption 1 and/or the NSA Act's "sources and methods" proviso that it once withheld under Exemption 2. If so, this is clearly invalid. See, for example, McGehee v. U.S. Dept. of Justice, 800 F.Supp.2d 220, 234 n. 8 ("Our Court of Appeals has made plain that 'as a general rule, [the Govern-ment] must assert all exemptions at the same time, in the original court proceedings[,]'" Maydak v. United States De't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000).

Item 6 does not state that the CIA Act Exemption 3 statute applies in its entirety to all 20 documents or each document in its entirety. Thus a segregability analysis must show each of the 20 documents it is said to apply to, and the portions of each document to which it is said to apply. The same is also true of Exemption 5. Again, it is not stated that Exemption 5 applies to each of the 20 documents it applies to in its entirety, and such a claim would be highly implausible. As United States District Court Judge John Bates noted in CREW v. Homeland Sec. ("CREW") , 648 F.Supp.2d 152 (2009), "a "draft" containing "talking points," that, without more context, such as the attachment's author, recipient, purpose or use, is insufficient to assess the exemption claim. Id. at 161, citing as a "see" example Judicial Watch, Inc. v. U.S. Postal Serv, 297 F. Supp. 2d 252. 265-66 (D.D.C.2004) (denying cross-motions for summary judgment with respect to "draft talking points" because the agency failed to identify specifics about the document's "place in a particular decisionmaking context... [or] whether, as a draft, these talking points were actually used in a communication with the public"). Id.

Judge Bates also asserted "[There also appears to be a substantial amount of factual material contained in this attachment and, as discussed above, such information is

generally subject to disclosure." Id., citing <u>Petroleum Info.</u>, 976 F.2d at 1434 ("Under the deliberative process privilege, factual information generally must be disclosed."). Judge Bates noted in addition that "since Exemption 5 may not apply to purely factual matters, the segregability analysis of the Exemption 5 claim must include this and other information." <u>Id</u>.

All of the CIA's DIF documents contain—but conceal—the kind of information that Judge Bates ruled in <u>CREW</u> is essential for a segregability analysis—"author, recipient, purpose or use" or purely factual matter."   Since the CIA has not provide the requisite segregability analysis of these records, the CIA has failed to meet its burden of proof and they must be disclosed.

    E.  <u>Analysis of CIA's Released-in-Part Vaughn Index</u>

For the most part, deficiencies in the CIA's <u>Vaughn</u> Index of its DOF documents are replicated in its RIP records.   There are some exceptions, however, as some of the documents are withheld under only one claim of exemption.   While this does not necessarily eliminate the necessity for a segregability analysis, it reduces it.   The following items on Exhibit B, the RIP <u>Vaughn</u> index, are entirely withheld under one claim of exemption:  (a) the Exemption 3 CIA Act claim:  Items 33, 38, 41, 58, 82, and 85; (b) the Exemption 3 NSA Act claim:  Items 15, and 44; (c) Exemption 6:  Items 1, 36, 69.  The merits of these claims are dealt with in the parts of this brief which deal with discuss each of these exemption claims.

Even where the RIP documents are not lengthy, there is no adequate segregability analysis.  For example, Attachment A hereto is a document released to Hall's counsel in 2015 which appears to correlated with Item 22 of the RIB index.  This is a six-page

document dated September 29, 1992. The last two pages are entirely withheld under Exemptions 1, the CIA Act, the NSA Act and Exemption 6. There is no indication that this huge redaction is being entirely withheld under each of these four exemption claims, and that clearly cannot be since index for this item mentions only a single name being withheld under Exemption 6. The index makes conclusory assertions the document is classified SECRET, even though it bears no classification stamp, and involves intelligence sources and methods. But the CIA does not define intelligence sources and methods, thus eroding the applicability of its status as an Exemption 3 claim. Nor is there any explanation of why it should remain classified SECRET now, 24 years after a Senate investigator requested a partial declassification of a spot report of POWs in Laos. Item 22 also claims the CIA Action 3 for these two pages without any indication as to what extent the CIA claims this information is covered by the other three exemption claims.

Attachment B represents a different problem regarding the RIP index. It is a Memorandum for the Deputy Director of Intelligence dated August 7, 1992. It appears to correlate to Item 17 on the RIP index, except that instead of being marked classified "SECRET" as the index indicates, has the word "SECRET" crossed out without any indication as to when this was done. The description of the Item 22 withholdings asserts that "[l]imited details regarding internal CIA/administrative matters were withheld under Exemptions (b)(1) and (b)(3)(National Security Act) because disclosure would reveal intelligence methods and activities." However, the document released to Hall in 2015 contains no such Exemption (b)(1) or (b)(3)Nastional Security Act) claims marked on it.

The last page of the document released does have a CIA Act (b)(3) claim for the distribution of copies to six persons, files or locations. This use of the CIA Act (b)(3)

statute is a proscribed use because it conceals from the public where information may be found.

II.     DEFENDANT HAS NOT MET ITS BURDEN OF PROOF
        TO SUSTAIN ITS LAIMS OF EXEMPTION PURSUANT TO
        EXEMPTIN 1, 5 U.S.C. § 552(b)(1)

This case concerns POWs and MIAs in Southeast Asia during the time of the Vietnam War, which the CIA states began in 1959 and lasted until 1974. In terms of the possible national security implications of the information at stake in this lawsuit, the overriding facts are (1) there have been no hostilities between the U.S. and Vietnam for a half century, and (2) most of the information at issue is more than 50 years old, and virtually all of it is more than 25 years old. Given these basic circumstances, it is puzzling that the CIA continues to claim that information at issue is properly classified, particularly since Vietnam and the United States are now strengthening their emerging alliance, economically, socially, politically and in terms of national security relationships. For the reasons set forth below, the CIA's Exemption 1 claims do not pass muster.

The CIA has submitted the Shiner Declaration in support of its Renewed Motion for Summary Judgment ("RMSJ"). At the outset, it must be noted that the Shiner declaration is largely based on CIA boilerplate. Although she states that she makes the statements in her declaration "based on personal knowledge," this is immediately qualified by "and information made available to me in my official capacity." Shiner Decl., ¶ 6. There is, then, uncertainty as to which facts and opinions are based on her own personal knowledge and which are based on hearsay received from others.

    A.  The FOIA's Statutory Text

Exemption 1 provides that the mandatory disclosure provisions of the Act do not apply to matters that are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order.

5 U.S.C. 552(b)(1).  Under the plain meaning of this language, an agency's classification determination must comply with both the procedural and substantive criteria set forth in the appropriate executive order. The determination must separately comply with <u>each</u> provision.

### B.   The CIA Fails to Comply with Exemption 1 Procedurally

The Shiner Declaration repeatedly cites Executive Order 13526 ("E.O. 13526") as the applicable Executive Order governing the records at issue.  At the beginning of her discussion of classification issues Shiner states that she "has determined" that "the records described above . . . are currently and properly classified. . . ."  Shiner, ¶ 36.  But in actually describing the markings which are required to be placed on a properly classified record, she switches to the passive and conclusorily asserts that "the documents are properly marked in accordance with section 1.6 of the Executive Order."  <u>Id</u>. ¶ 41. The documents she refers to do not show the classification markings that should have been applied in conformity with E.O. 13526.  Rather than stating when these records were marked, by whom, and pursuant to what authority, Shiner is silent on these critical details.

Under E.O. 13526, according to Shiner, virtually all the records at issue in this case were automatically declassified twenty-five years after the date of the document or

the information contained in it "and otherwise have been determined to have permanent

historical value. . . ." ." Id. ¶ 53. However, Shiner invokes § 3.3(b) of E.O. 13536 as

exempting certain kinds of information from automatic declassification after 25 years

when "the information, if released, should clearly and demonstrably be expected to reveal

the identities of human intelligence sources." Id. Actually, the cited provision is not

limited to just "human intelligence sources." It provides: "(b) An agency head may

exempt from automatic declassification under paragraph (a) of this section specific

information, the release of which should clearly and demonstrably be expected to," to

reveal information in one or more of 9 specific categories of information which are

listed. Shiner, of course, is not "[a]n agency head," nor does she show that she was

properly delegated to act on behalf of the CIA. Having failed to make these showings,

the CIA has waived them.

    Most importantly, Shiner invokes the E.O.'s provision which applies to automatic

declassification after 25 years when the pertinent provision for many of the records at

issue is 50 years, not 25 years. These are governed not by § 3.3(b) but by § 3.3(h).[1] This

provision is dramatically different than the one relied upon by Shiner. To begin with, this

provision reduces the number of categories of information whose unauthorized disclosure

---

[1] In a footnote, Shiner notes that five documents in the Denied-in-Full ("DIF") Vaughn
index are undated. She states that "having been unable to discern the true date of these
documents, I will use the analysis applicable to documents older than 25 years." Id. ¶ 53,
n.3. Since she does not adduce any evidence in support of this claim that the documents'
exemption status must be measured under the twenty-five year rule as opposed to the 50-
year rule, the CIA cannot meet its burden of proof on this issue. § 3.3(h)(3), which
provides for automatic declassification of records more than 75 years obviously does not
apply, since the period at issue in this case commenced in 1959. Many of the records
here are more than 50 years old. This, and the fact that E.O. 13526 is heavily weighted
against continued secrecy, indicate that the Court should treat these records under §
3.3(h) rather than § 3(b).

might be expected to cause harm from nine to two: "(A) the identity of a confidential

human source or a human intelligence source; or (B) key design concepts of weapons of

mass destruction." Id. § 3.3(h)(1)(A) and (B).  Presumably the CIA would concede that

"design concepts of weapons of mass destruction are not involved in the records at issue.

   This section also requires a standard of expected damage resulting from

unauthorized disclosure that a is way beyond that provided in  § 3.3(b).  It states that "[i]n

extraordinary cases, agency heads may, within 5 years of the onset of automatic

declassification, propose to exempt additional specific information from declassification

at 50 years." Id. § 3.3(h)(2)(emphasis added).  No "agency head" or official properly

delegated by such an agency head has made a showing that any of the information at

issue in this case is of such a nature that its unauthorized disclosure would warrant

exemption from automatic declassification.  Not having made any such showing, the CIA

has waived any argument it might make that the specified exemption applies to the

materials sought in this case.   § 3.3(h)

   To top it off, § 3.3(h) provides that "[n]ot later than 3 years from the effective

date of this order, all records exempted from automatic declassification under paragraphs

(b) and (c) of this section shall be automatically declassified on December 31 of a year

that is no more than 50 years from the date of origin. . . ." Id. (emphasis added).

Section 3.3 became effective the date E.O. 13526 was issued, December 29, 2009.  § 6.3.

Thus, any extension of the period for automatic declassification of records more than 50

years old expired June 29, 2010.  We are now more than six years past the date by which

any determination to extend the time for declassification expired.  As of June 30, 2010,

the records and information more than 50 years old was automatically declassified except for the two categories specified in § 3.3(h)(1)(A) and (B).

### C. The CIA Has Not Met Its Burden of Showing that the Withheld Materials Are Properly Classified Substantively

As noted above, the FOIA exempts from mandatory disclosure materials that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy. . . ." 5 U.S.C. § 552(b)(1). Although the Shiner Declaration contains boilerplate language invoking both "national defense" and "foreign policy," she does not explain how under any common-sense definition the records at issue at this point involve national defense or foreign policy. "Defense" is by definition resistance to an attack. Shiner points to no nation, political movement, or intelligence service that is currently engaged in attacking the United States or any of its agencies over the issue of missing POWs and MIAs. With regard to "foreign policy," Shiner sets forth no specific details warranting any expectation of damage to U.S. national security arising out of current foreign policy concerns involving Viet Nam, the U.S. or others involved in the missing POW/MIAs issue.

Executive Order 12356 is markedly different from predecessor executive orders. It emphasizes the need for greater disclosure in light of the end of the Cold War. It makes the passage of time a compelling factor favoring the disclosure of information allegedly classified long ago.

The push to end unwarranted classification of documents hoary with age is not limited to President Obama's Executive Order, E.O. 13256. Congress, too, has weighed in very heavily on this issue. In unanimously passing the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), 44 U.S.C § 2107

note, Congress mandated the prompt disclosure of all Kennedy assassination-related records. Congress provided that all such records would be released by 2017 unless the President of the United States personally found that their postponed disclosure should be continued. As a consequence of this legislation, more than five million pages of records have been released and deposited in the National Archives' JFK Records Act Collection. These records are essentially the same age as those at issue here. Or younger. The JFK Act, among other things, required the release of the JFK assassination records gathered by the House Select Committee on Assassinations ("HSCA") which did not terminate its investigation until 1978, only 34 years ago. Yet those records were largely made public long ago.

Additionally, in 1998, Congress passed the Nazi War Crimes Disclosure Act ("NWCDA"). Because of the CIA's resistance to release of these records, Congress had to twice amend it before it became effective. By 2011, however, millions of pages had been released with comparatively little information still withheld. For example, In DiBacco v. Dept. of Army, et al., (originally Carl Oglesby v. Dept. of the Army, et al., Civil Action No. 87-3349,    the Government released in their entirety approximately 114,000 out of 117,000 pages pertaining to Oglesby's request for records relating, inter alia, to Nazi German General Reinhard Gehlen, the Gehlen Organization, and post-World War II Nazi organizations. This massive disclosure revealed information of enormous public value, including the revelation that General Gehlen's Organization, which the U.S.

made the fulcrum of its counterintelligence in Europe and the Soviet Union, had been heavily infiltrated by the KGB.[2]

The disclosures made under the JFK Records Act and the NCRDA show widespread congressional and public support for the release of records that no longer need protection against disclosure. The CIA's continued recalcitrance is profoundly at odds with the public mandate for disclosure.

Nor are these the only or most recent examples of Congress acting to compel the release of information of profound interest to the public despite its national security classified nature. Congress recently approved, over President Obama's veto, the release of information raising deeply disturbing questions about the possible involvement of powerful Saudi Arabian forces in the 9/11 attack on the Twin Towers in New York. The information at issue there was far more sensitive than that here but only 15 years old.

In his dissent in Center for National Securities Studies v. DOJ, 331 F.3d 918 (D.C. Cir. 2003)("CNSS"), Judge Tatel asserted that the claims of Government officials simply cannot be accepted at face value: ". . . the public has a fundamental interest in being able to examine the veracity of such claims." Here, there are a number of reasons to trust the validity of the CIA's claims that information at issue still needs to be withheld. First, there is an inherent institutional bias on the part of the CIA's affiant. Her declaration recites that prior to her present position she served in the Directorate of

---

[2] The records obtained by DiBacco, Carl Oglesby's daughter, also led to the discovery that a convicted Nazi assassin, Werner von Alvensleben, had been in Dallas near the time of the Kennedy assassination, and that he was a close friend of D. Harold Byrd, the owner of the Texas School Book Depository Building from which Lee Harvey Oswald allegedly fired shots at President Kennedy. He reportedly at Safarilandia, a big-game funing preserve owned by Von Albensleben at the time of the assassination and returned to Dallas shortly thereafter, where he removed the windowsill from which Oswald allegedly fired the shots which killed Kennedy and mounted on display at his mansion.

Support and before that was the Deputy Information Review Officer ("IRO") for the

Director's Area.  Thus, her experience is with information that may be extremely

sensitive.  By experience and training she is obligated to do her utmost to protect

allegedly classified information from exposure.  She is not a neutral observer.  Her

statements regarding what damage can reasonably be expected from disclosure of these

ancient records must be treated with skepticism.  Without exercising such skepticism,

determining what information remains properly classified becomes a rubber

stamp process.  This is what was at play under the original FOIA when the Supreme

Court decided EPA v. Mink, 410 U.S. 73 (1973).  Mink, held that

> . . . Congress has conspicuously failed to
> attack the problem that my Brother Douglas
> discusses.  Instead, it has built into the Freedom
> of Information Act an exemption that provides
> no means to question an Executive decision to
> stamp a document "secret," however cynical,
> myopic, or even corrupt that decision might have
> been.  (emphasis added)

Congress overturned Mink when it amended the FOIA in 974.  The amended FOIA

established the bulwark principle that information has to be classified both procedurally

and substantively in order to be exempt from compulsory disclosure under FOIA.

The CIA wants this Court to grant great deference to its determination regarding

national security issues in this case.  Judge Tatel addressed the law concerning the

"substantial deference" issue in his dissent in CNSS.  "In any event, the government's

case fails even under the heightened deference we have applied in Exemption 1 and

National Security Act cases.  No matter the level of deference, our review is not

'vacuous.'"  Id. quoting Pratt v. Webster, 673 F.2d 408, 421  (D.C.Cir.1982).  He further

stated that "even when reviewing Exemption 1's applicability to classified materials, we

have made it clear that no amount of deference can make up for agency allegations that display, for example, 'a lack of detailed specificity, bad faith [or] failure to account for contrary record evidence,' since deference is not equivalent to acquiescence.'" Id., quoting Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 30 (D.C.Cir.1998).

The amendments to Exemption 1 "reflect legislative intent to authorize the courts to engage in "'a full review of agency action' with respect to information classified under an executive order." Roffman, "Freedom of Information: Judicial Review of Executive Security Classifications," XVIII University of Florida Law Review 551, 554 (1976)("Roffman, *Judicial Review*"), citing H.R. Rep. No. 1380, 93d Cong., 2d Sess. (974), reprinted in 5 U.S. Code Cong. & Ad. News at 6273 (1974)("Legislative History"). The House Report recommending passage of the amendments "states that under the (b)(1) exemption, a district court 'may look at the reasonableness and propriety of the determination to classify the records under the terms of the Executive order.'" Id.

The amendments to Exemption 1 "reflect legislative intent to authorize the courts to engage in "'a full review of agency action' with respect to information classified under an executive order." Roffman, *Judicial Review.* At 554, citing H.R. Rep. No. 1380, 93d Cong., 2d Sess. (974), reprinted in 5 U.S. Code Cong. & Ad. News at 6273 (1974) ("Legislative History"). The House Report recommending passage of the amendments "states that under the (b)(1) exemption, a district court 'may look at the reasonableness and propriety of the determination to classify the records under the terms of the Executive order.'" Id.

While the FOIA places the burden of proof on an agency to sustain its action, 5 U.S.C. § 552(a)(B), it is "silent . . . as to the evidential weight to be accorded executive

determinations pursuant to established national defense and foreign relations criteria."

Roffman, *Judicial* Review at 557.  In response to a specific objection by President Ford,

the Conference Report which accompanied the amended Act noted that "Executive

departments responsible for national defense and foreign policy matters have unique

insights into what adverse effects might occur as a result of public disclosure of a

particular classified record."  As a result, the conferees stated their expectation that

"Federal courts, in making <u>de novo</u> determinations (under the executive order exemption)

. . . will accord substantial weight to an agency's affidavit concerning the details of the

classified status of the disputed record."  <u>Id</u>. at 558, quoting H.R. Rep. No. 1380, 93d

Cong., 2d Sess. (1974), <u>Reprinted in</u> *Legislative History* at 6290.  But as Roffman

explains in his law review article:

> This suggestion by the conferees is merely a
> reminder that those within the executive branch
> authorized to make security classifications will
> often be in a better position to evaluate the need
> for classification than the party seeking disclosure.
> The conferees have not suggested that the evi-
> dence of the party seeking disclosure should be
> afforded any less "substantial weight."  In fact,
> the legislative history indicates that it was Con-
> gress' intent that the evidence of both parties be
> accorded equal weight, commensurate with the
> degree of expertise, credibility, and persuasiveness
> underlying it.  More fundamentally, the "substantial
> weight" suggestion of the conferees should in no way
> be taken to suggest the imposition of a presumption;
> Congress in its initial consideration of the 1974
> amendments, specifically rejected a similar pre-
> sumption contained in the Senate draft of the bill.

<u>Id</u>. at 558-559 (footnotes omitted).

In this case weight to be assigned to the CIA's affidavits is greatly reduced,

indeed, eliminated, by the failure of the CIA's declarant to take into account the passage

of time, changed circumstances, and vast public release, through the press and in

Congress, of the same kind of information being withheld by it in this case.

In an attempt to bolster its extremely weak case for continued classification of the

still-withheld information, the CIA relies upon the "mosaic theory" to support its claims.

A Yale Law Journal article by David Pozen, *The Mosaic Theory, National Security, and

the Freedom of Information Act,* 115 YLJ 628 (2005), examines the theory in depth.

While he concludes there is a sound basis for the theory, he cautions that:

> Highly speculative mosaic claims will always provide
> a challenge to a reviewing court, but delegation
> exacerbates the theory's potential for misuse. It is
> hard to see in delegation much more than courts
> "acquiescence" or to reconcile it with FOIA's text and
> purpose. It is hard to miss in North Jersey Media's
> Abdication approach the acquiescence; the opinion
> Flaunts it.

Id. at 679 (footnote omitted).

Pozen's article was written before the issuance of E.O. 13526 in late 2009. The

Obama order reflects an extraordinary change in both the procedural and substantive

standards governing information subject to automatic declassification after 50 years. In

light of that change, which favors disclosure of such records to an extremely high degree,

the mosaic theory needs to be applied in reverse. That is, the potential benefit stemming

from the disclosure of seemingly isolated pieces of information must be considered

greatly heightened once such information is subject to automatic declassification after

fifty years. The disclosure of the bits of information may ultimately link up assist in the

identification of a missing POW. It is therefore an error to delete such miscellaneous bits

and pieces on the ground that are meaningless.

III.     THE CIA HAS NOT MET ITS BURDEN OF PROOF UNDER

<u>EXEMPTION 3, 50 U.S.C.</u> § 3707

The CIA invokes two withholding statutes to justify redactions in the withheld materials: (1) the National Security Act of 1947 ("NSA Act"), 50 U.S.C. §3024, as amended; and, (2) the Central Intelligence Agency Act of 1949 ("CIA Act"), 50 U.S.C. § 3507, as amended. Each of these statutes is discussed separately below.

A. <u>The CIA Act Exemption 3 Statute. 50 U.S.C. §.C. 3507</u>

The CIA Act exempts the agency from publishing or disclosing "the organization, names, official titles, salaries, or numbers of personnel employed by the [CIA]." 50 U.S.C. §3507. Shiner badly misinterprets this provision.

In <u>PhillippI v. CIA</u>. 546 F.2d 1009,1015 n.14 (D.C. Cir. 1976), the D.C. Circuit "cautioned that the CIA Act does not permit the agency "to refuse to provide any information at all about anything it does." Similarly, in <u>Baker v. CIA</u>, 580 F.2d 664, 669 (D. C. Cir. 1978), the court held that the CIA Act applies to "personnel information." As United States District Court Judge Cooper recently noted, "[d]espite these admonitions, the agency has recently asserted the CIA Act in a bevy of cases, including this one, to exclude information regarding the organization and functions of the agency generally, on the theory that the CIA only functions through the acts of its employees." <u>Sack v. CIA</u>, C.A. No. 12-0537 (CRC), Opinion and Order, (D.D.C. Sept. 16, 2014) at 3-4, citing <u>Sack v. CIA</u> ("<u>Sack</u>"), No. 12-244, 2014 WL 3375568, at *9 (D.D.C. July 10, 2014); <u>Whitaker v. CIA</u>, No. 12-316, 2014 WL 914603, at *6-7 (D.D.C. Mar. 10, 2014); <u>Nat'l Sec. Counselors v. CIA</u>, 960 F. Supp. 2d 101,176 (D.D.C. 2013).

Judge Cooper ruled that "[t]he phrase 'of personnel employed by the Agency' applies to each item in the list 'organization, functions, names, official titles, salaries, or

numbers' and thus the CIA Act only applies to personnel information." <u>Sack</u> at 4 (emphasis added).

The Shiner Declaration does not state that the documents she addresses are personnel documents, and a review of the records indicates that they are not personnel records but the kind of records normally generated in gathering and disseminating intelligence information.

To the extent that any of the information withheld by the CIA as being within the scope of 50 U.S.C.§ 3507 does constitute personnel information, there is a further hurdle which Shiner fails to mount.  § 3507 specifies that the information it protects must relate to "personnel employed by the [CIA]." Even assuming that some of the withheld information is personnel material, no showing has been made by Shiner that these persons are still employed by the CIA. Given the passage of decades, the chances that they are still employed by the CIA are slim.

### B.  The National Security Act of 1947, 50 U.S.C. §3024

The CIA also relies upon the National Security Act of 1947 ("NSA Act"), 50 U.S.C. §3024, which protects against the unauthorized disclosure of intelligence sources and methods. But this Exemption 3 statute is subject to the same kinds of concern pointed out in <u>King</u>. <u>See</u> <u>supra</u> at 6-8. Is the source still living? Has the source or method been disclosed?  Is the source or method really unknown to foreign governments and institutions and the press? Does the CIA considered disclosures made by Congress or institutions other than the CIA "unauthorized"?

A district court should have considerable skepticism about  claims  of exemption for intelligence sources and methods in this case.  Indeed, because the CIA is able to

invoke its Exemption 3 statutes without having to show that the material allegedly protected by it is properly classified, even greater skepticism is required to protect against abuse of the claim.

IV.   THE CIA HAS FAILED TO MEET ITS BURDEN OF PROOF
      TO SHOW THAT ITS EXEMPTION 5 CLAIMS ARE VALID

   A.  Legal Standard for Deliberative Process Privilege

Under the FOIA Improvement Act of 2016, Exemption 5 was A is amended to provide that "the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." Exemption 5, 5 U.S.C. § 552(b) (5), provides that the FOIA does not apply to matters that are:  "(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested. . . ."

Exemption 5 was intended to incorporate the government's common law privilege from discovery in litigation. H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966); S. Rep. No. 813, 89th Cong., 1st Sess. 29 (1966); S. Rep. No. 1219, 88th Cong., 2d Sess. 607, 13-14 (1964).  However, the Supreme Court has cautioned that discovery rules be applied to FOIA cases only "by way of rough analogies." Mink, supra, at 86.

the CIA invokes 5's privilege for the deliberative process privilege.  The ultimate burden which an agency must carry under this privilege is to show that the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communications within the agency.  Coastal States Gas Corp., supra ', 617 F.

2d at 866. Congress intended to confine Exemption 5 "as narrowly as [is] consistent with efficient Government operation." _Id_. at 868, quoting S. Rep. No. 813, 89th Cong., 1st Sess. at 9 (1965). The agency must show "by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." _Senate of Puerto Rico v._ _U.S. Dept. of Justice_ ("Senate of P.R."), 823 F.2d 574, 585 (D.C. Cir. 1987), quoting Mead Data Central, Inc. v. Dep't of the Air Force, 566 F. 2d 242, 258 (D.C. Cir. 1977). The possibility that disclosure will be "likely in the future to stifle honest and frank communications within the agency" depends on the identities of the author and recipient of the communication being disclosed. Here, such damage cannot occur because the identities of the author and recipient of these communications can be deleted. See Hoch v. C.I.A., 593 F. Supp. 675, 689 (D.D.C. 1984) ("given the anonymity of [blind memorandum], [the CIA] has failed to show by specific and detailed proof that disclosure of this document would defeat rather than further the purposes of FOIA").

An agency invoking Exemption 5's deliberative process privilege bears the burden of demonstrating that the material at issue is predecisional and deliberative. Schlefer v. United States, 702 F. 2d 233,237 (D.C. Cir. 1983); Paisley v. C.I.A., 712 F. 2d 687, 698 (D.C. Cir. 1983) ("The agency bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process.").

In order to uphold an Exemption 5 claim on grounds that the document is predecisional, "a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" SenaTe of P.R. at 585, quoting Paisley at 698 (D.C. Cir. 1983), _vacated in part on other grounds,_ 24 F.2d 201 (D.C. Cir. 1984). If there is no definable

decision-making process that results in a final agency decision, then the documents are not predecisional." Id. citing *V*aughn v. Rosen, 523 P.2d 1136, 1146 (D.C. Cir. 1975). Moreover, "[p]redecisional communications ' are not exempt merely because they are predecisional; they must also be part of the agency give-and-take by which the decision itself is made.'" Senate of P.R.. at 585, quoting Vaughn 1144.

Finally, where an agency in making a final decision "chooses expressly to adopt or incorporate by reference" a predecisional recommendation, that document loses its protection under Exemption 5. NLRB v. Sears, 421 U.S. at 161. This principle applies to a wide range of agency recommendations, and to "formal or informal adoption." Coastal States at 866.

Earlier in this case, Hall discussed the application of these principles as set forth in the decision by Judge Bates in CREW. See supra at 11-12. These examples make clear that the CIA's invocation of Exemption 5 is without foundation.

B. Extreme Government Wrongdoing Vitiates Privilege

Agency bad faith in the litigation is relevant because it undermines the credibility of the agency's statements in its affidavits. Allen v. CIA, 636 F.2d 1287 (D.C.Cir. 1980). The same result is warranted where the agency engaged in bad faith in the activities that generated the records at issue. "[W]here it becomes apparent that the subject matter of a request involves activities which, if disclosed, would publicly embarrass the agency or that a so-called 'cover up' is presented, government affidavits lose credibility." Rugiero v. U.S. Dept. of Jusstice, 257 F.3d 534 (6th Cir. 2001).

Additionally, government misconduct vitiates the deliberative process privilege, mandating disclosure of what otherwise may be exempt deliberative materials. See Tri-

State Hosp. Supply Corp. v. U.S., 226 F.R.D. 118, D.D.C., 2005: The deliberative

process privilege yields, however, when government misconduct is the focus of the

lawsuit. In such instances, the government may not use the deliberative process privilege

to shield its communications from disclosure. Thus, "if either the Constitution or a statute

makes the nature of governmental officials' deliberations *the* issue, the privilege is a

nonsequitur." In re Subpoena Duces Tecum Served on Office of the Comptroller of

Currency, 145 F.3d 1422, 1424 (D.C.Cir.1998) (citations omitted). Simply put, when

there is reason to believe that government misconduct has occurred, the deliberative

process privilege disappears. Id.; In re Sealed Case, 121 F.3d 729, 746 (D.C.Cir.1997).

See also In re Subpoena Served Upon Comptroller of Currency, 967 F.2d 630, 634

(D.C.Cir.1992); Alexander v. FBI, 186 F.R.D. 170, 177 (D.D.C.1999) (citations omitted).

This Court discussed the application of this principle to the (b)(5) exemption in

ICM Registry, LLC v. U.S. Department of Commerce, 538 F. Supp. 2d 130, 133 (D.D.C.

2008): In this court, the deliberative process privilege has been disregarded in

circumstances of extreme government wrongdoing. See, e.g., Alexander v. FBI, 186

F.R.D. 154, 164 (D.D.C. 1999) (no privilege where documents related to misuse of a

government personnel file to discredit a witness in an ongoing investigation of Clinton

administration); Tax Reform Research Group v. Internal Revenue Service, 419 F. Supp.

415, 426 (D.D.C. 1976) (no privilege where documents concerned recommendation to

use the powers of the IRS in a discriminatory fashion against "enemies" of the Nixon

administration).

The privilege does not apply where the plaintiff's allegations "place the

deliberative process itself directly in issue." Dominion Cogen D.C., Inc. v. District of

Columbia, 878 F.Supp. 258, 268 (D.D.C. 1995).  In *Tax Reform Research Grp. v. IRS*,

419 F. Supp. 415 (D.D.C. 1976), the court refused to permit the government to invoke

Exemption 5 and ordered the release of withheld documents where the documents at

issue "simply cannot be construed as being part of any proper governmental process." Id.

at 426. Similarly, in Judicial Watch of Florida, Inc. v. U.S. Dep't of Justice, 102 F. Supp.

2d 6 (D.D.C. 2000), another court in this District recognized that the exception could be

invoked in FOIA suits.

    The court in Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs. (D.D.C.,

2012) concluded, "[c]onsistent with these cases, the Court here finds that the

government-misconduct exception may be invoked to overcome the deliberative-process

privilege in a FOIA suit.  The party seeking release of withheld documents under this

exception must "provide an adequate basis for believing that [the documents] would shed

light upon government misconduct." Judicial Watch of Florida, Inc., 102 F. Supp. 2d at

15; *see also ICM Registry*, 538 F. Supp. 2d at 133.

    In this case, the deliberative process privilege under exemption (b)(5) was

asserted for three released-in-part records, as reflected in the sample Vaughn index (entry

numbers 26, 62, 79), and for 17 of the denied-in-full documents ("DIF") (entry numbers

1-2, 5-7, 9, 11-14, 20-21, 23, 25, 32, 34-35).  As Hall pointed out above, of the 48

numbered items which comprise the DIF index, seven contain more than 10 pages. The

use of the date of the "package" conceals the dates of the 20 CIA documents and the date

of the information they describe.  Obviously, the Court and plaintiffs *cannot tell whether*

the deliberative process privilege is being asserted to records "created 25 years or more

before the date on which the records were requested."

Here, the basis for plaintiffs' charge of a cover-up rests on the fact that President Richard Nixon in Operation Homecoming proclaimed on national television that all Vietnam War POWs were coming home. This was not true, and the CIA is still covering up the extent of that deception.

In support of their allegations, plaintiffs have proffered affidavits and testimony from indisputably qualified experts, as well as dozens of examples in the record of operations, events and activities which surely generated relevant CIA records that have not been provided.

## V. THE CIA HAS FAILED TO MEET ITS BURDEN OF PROOF TO SHOW THAT ITS EXEMPTION 6 CLAIMS ARE VALID

### A. General Legal Standard

Exemption 6, 5 U.S.C. § 552(b)(6), permits nondisclosure of matters "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The language "clearly unwarranted invasion of personal privacy," it has been held, "instructs the court to tilt the balance in favor of disclosure." Getman v. NLRB, 450 F.2d 670, 674 (D.C.Cir.1971). The privacy invasion must be tangible and substantial: ". . . Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities." Rose, supra, 425 U.S. at 380 n.19. Moreover, it is the "production" of the records, not the resultant speculation to which they may give rise, by which the invasion of privacy must be measured. Arieff v. Department of Navy, 712 F.2d 1462, 1469 (D.C.Cir.1983).

In view of these constraints upon the scope and application of Exemption 6, the agency normally faces a difficult task in overcoming the statutory presumption in favor

of disclosure.  As the First Circuit has said, the Exemption 6 case to which "the calculus unequivocally supports withholding [is] a rare case because congress has weighted the balance so heavily in favor of disclosure. . . ." Kurzon v. Department of HHS, 649 F.2d 65, 67 (1st Cir.1981).  Accord:  Local 598 v. Department of Army Corps of Engineers, 841 F.2d 1459, 1463 (9th Cir.1988) ("particularly under Exemption [6], there is a strong resumption in favor of disclosure"); Washington Post Co. v. U.S. Dept. of Health, Etc., 690 F.2d 252, 261 (D.C.Cir.1982)(". . . under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act").

If a privacy interest exists, the court must balance the privacy interests against the public interest in disclosure.  However, for Exemption 6 to support withholding, the privacy invasion must be very strong.  National Ass'n of Retired Fed. Employees v. Horner ("NARFE"), 879 F.2d 873, 874 (D.C.Cir.1989)(privacy interest at stake must be significant or substantial).   Rose, supra, at 372; Washington Post Co., 690 F.2d at 258. The legislative history indicates that in order for a cognizable privacy invasion to exist under Exemption 6, the withheld material must concern the "personal" or "intimate" details of a person's life.  S. Rep. No.  813, supra, at 9; H.R. Rep. No. 1497, supra, at 11, such that disclosure of the facts might "subject the person to whom they pertain to embarrassment, harassment, disgrace, loss of employment or friends." Brown v. Federal Bureau of Investigation, 658 F.21d 71, 75 (2d Cir.1981).

The Court of Appeals has held that for Exemption 6 to apply, disclosure must "compromise a substantive as opposed to a de mimimis privacy interest." NARFE, 879 F.2d 673, 875 (D.C.Cir.1989)  The privacy interest is balanced against the public interest

only if there is a substantial privacy interest at stake.  Otherwise, the information must be disclosed because of the inherent public interest in disclosure.

Much of the information which the CIA seeks to delete in this case pertains to persons who were government officials.  Government officials are not entitled to the same degree of privacy as private citizens.  Lesar v. United States Dept. of Justice, 636 F.2d 472 (D.C.Cir.1980)("[i]n their capacity as public officials, FBI agents may not have as great a claim to privacy as that afforded ordinarily to private citizens, but the agent by virtue of his official status does not forego altogether any privacy claim in matters related to official business."  Id. at 487.

Additionally, many of the officials whose names and identifying information appear in the documents at issue in this case are likely either retired or deceased.  These circumstances further erode the viability of privacy protection.  The D.C. Circuit has so held.  See Campbell, supra, 164 F.3d at 33: "death clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that map plague the living."  A court balancing public interests in disclosure against privacy interests "must therefore make a reasonable effort to account for the death of a person on whose behalf the FBI invokes exemption 7(C)."  Id.  The CIA has failed to show that this was done here.  To the contrary, as Hall pointed out above, the CIA assigned no weight to the public interest in disclose in finding that the signature of an Assistant to the President of the United States and a United States Senator were entitled to privacy protection.  See supra at 4.

## VI. THE CIA HAS NOT MOVED FOR SUMMARY JUDG-
   ## MENT AS TO NATIONAL SECURITY AGENCY REFERRALS

The CIA has not filed a motion for summary judgment with respect to the referral of records to the NSA for its evaluation of its equities in such materials. The CIA represents, however, that with respect to Item 5 of Hall's FOIA request,

> the Agency located seven responsive documents
> originating with other agencies, specifically the
> Department of Defense (DOD), and the National
> Security Agency (NSA). CIA sent referral letters
> to those two agencies in September 2011 for direct
> response to plaintiffs, and the Court's 2012 Order
> instructed the Agency to ensure that the referrals
> were being processed. Consistent with the Order,
> CIA followed up with both agencies, notifying the
> Court in its November 2012 Status Report that
> NSA had sent an update to Plaintiffs on October 5,
> 2012 and DOD planned to have its review completed
> no later than December 2012. Based on subsequent
> interactions with Plaintiffs and the agencies, it is CIA's
> understanding that this issue has been resolved.

CIA's Local Rule 7(h) Statement of Material Facts ("SMF"), ¶ 4, citing

Shiner Decl. ¶ 16 (emphasis added).

Plaintiffs did represent at the July 2, 2013 status hearing that they would narrow the scope of Hall's request to exclude certain personnel records. Hall's counsel, James H. Lesar, stated:

> We have agreed to narrow the request. We
> will exclude certain categories such as leave records,
> medical records, pay records, personal
> correspondence, the schooling of children,
> and benefits of survivors. And I can work
> that out with counsel for the CIA later as to
> the exact terms, but that, in general, is what
> we've agreed to exclude.

ECF # 198. Transcript of July 2, 2013 Status Hearing, at 4.

Plaintiffs did not thereby agree not to challenge redactions that were made in the referrals the CIA made to NSA. Nor did plaintiffs agree that they were barred from pursuing further searches based on leads derived from the NSA referrals.

The NSA inventory is just that, it is not a <u>Vaughn</u> index. The NSA inventory is reproduced as Attachment C hereto. The inventory is not an accounting of all consultancy and direct referrals that Hall is entitled to. A brief glance at it reveals that many of the documents referred to NSA by the CIA were re-referred by NSA to other agencie—DOD, Air Force, State, and Army. There must be a complete accounting of all these referrals.

The documents provided by the NSA contain much valuable information regarding, missing attachments, distribution of copies, and infoI. *****

VII.   THE CIA HAS NOT MET ITS BURDEN OF PROOF
       AS TO THE ADEQUACY OF THE SEARCH

A. <u>Legal Standard Governing Search Issue</u>

To prevail in a FOIA case, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." <u>National Cable Television Ass'n v. FCC</u>, 479 F.2d 183,186 (D.C.Cir.1973). Agency affidavits regarding the search for responsive records are inadequate to support summary judgment where they "do not note which files were searched or by whom, do not reflect any systematic document location, and do not provide information specific enough to enable [the plaintiff] to challenge the procedures utilized." <u>Weisberg v. United States Dept. of Justice</u>, 627 F.2d 365,371 (D.C.Cir.1980).

When the adequacy of the agency's search is in dispute, summary judgment is inappropriate as to that issue. See Founding Church of Scientology, Inc. v. Nat. Sec. Agency, 610 F.2d 834, 836-37 (D.C. Cir. 1979)("To accept its claim of inability to retrieve the requested documents in the circumstances presented is to raise the specter of easy circumvention of the [FOIA] . . . and if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory.").

It is a truism that the issue is not whether the documents might exist that are responsive to the request, but rather whether the search conducted by the agency was "adequate." Weisberg v. Department of Justice, 745 F.2d 1476,1485 (D.C.Cir.1984)(emphasis in the original); Meeropol v. Meese, 790 F.2d 942,956 (D.C.Cir.1986)("[a] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request.") In Truitt v. Department of State, 897 F.2d 540 897 F.2d 540 (D.C.Cir.1990), the Court of Appeals expatiated on this standard:

> It is elementary that an agency responding to a
> FOIA request must conduct a search reasonably
> calculated to uncover all relevant documents,' and,
> if challenged, must demonstrate 'beyond a material
> doubt' that the search was reasonable. "'The issue is
> not whether any further documents might conceivably
> exist but rather whether the government's search for
> responsive documents was adequate.' The adequacy
> of an agency's search is measured by a standard of
> reasonableness,' and is dependent upon the circumstances of
> the case."'

Id. at 642 (footnotes omitted)(emphasis added). If such doubt exists as to the adequacy of the search, Truitt counsels, "summary judgment for the agency is not proper." Id. (footnote omitted). Where the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order[,] Foundinp Churach, supra, 610 F.2d at 836, and the plaintiff is entitled to take discovery on the adequacy of the search. Weisberg, supra, 627 F.2d at 371.Here, the CIA has not demonstrated "beyond a material doubt," that the search that it conducted was reasonable. Accordingly, Hall should be allowed to pursue discovery and this Court should order the CIA to conduct further searches.

It is clear that the CIA has failed to conduct an adequate search. Indeed, a plethora of evidence indicates that the CIA has failed to meet its obligation to search for, locate, retrieve and produce responsive records.

VIII.   DISCOVERY, IN CAMERA INSPECTION, APPOINTMENT   OF
        SPECIAL MASTER ARE REQUIRED TO RESOLVE THIS CASE

A. Discovery

In his 2008 Renewed Motion for Summary Judgment and Other Relief ("2008 RMSJ, Etc."), Hall  presented several arguments why discovery is needed in this case. See 2008 RMSJ, Etc. at 19. The grounds set forth then remain valid now.  In fact they have been fortified.  First, a very substantial amount of material remains classified, both in the DIF Vaughn index and in the RIP index.  As has been shown by past disclosures, such classified materials contain information that identifies search leads:  incidents, raids, photographs, intelligence reports, file locations, document distribution lists, photographs

and so forth.  Without access to such material, the adequacy of the search remains impenetrable.

Photographs are of primary interest to Hall because of the valuable information they provide about raids, incidents, plans and programs to locate POWs at specific sites. This Court has instructed that Hall be provided with actual copies of such photographs, films and imager, not just be given poor quality Xerox copies.  Yet no actual photograph copies have been provided.  As Hall's current declaration is studded with documents showing the existence of such photographic materials that have not been produced. Discovery is needed to determine why they have not been retrieved and reproduced in actual photographic format.

Second, many materials which Hall's prior affidavit relied upon to contests the CIA's early motions for summary judgment were ordered stricken when Judge Kennedy partially granted a recommendation by a Magistrate Judge that they be stricken as inadmissible under Rule 56(e). The only way Hall has of rehabilitating that evidence and making potent use of it is through discovery

Third, Hall continues to be hampered in presenting evidence by the death potential witnesses. This problem is further increased by the unwillingness of others with significant information about CIA operations and activities regarding POW/MIAs to provide such information without what they regard as the protection of a court subpoena.

Fourth, it is now clear, as Hall mentioned in his Background statement above, that the existing search mechanism is badly flawed.  Discovery to date has been limited to the Vaughn index variety which is a very limited discovery mechanism which remains largely under the control of government agencies and is

strongly reliant on index searches alone, without FOIA plaintiffs being able to determine

how and to what extent materials are indexed.  The CIA has circumscribe the scope of its

searches to certain file "systems," without Hall being able to question whether there are

other file "locations" outside these "systems" which need to be searched.

B.  In Camera Inspection

In Allen v. Central Intelligence Agency, 636 F.2d 1287, 1298-99 (D.C.Cir.

D.C.Cir.1980), the Court of Appeals laid down guidelines for in camera inspection of

records.  It listed six factors for a district court to consider:  (1) judicial economy; (2) the

conclusory nature  of the agency's affidavits; (3) bad faith on the part of the agency; 4)

disputes concerning the contents of the document; (5) the agency proposes in camera

inspection; and (6) strong public interest in disclosure.

With respect to the first factor, judicial economy, there are many documents at

issue in this lawsuit.  However, plaintiffs suggest that they be permitted to select a small

number of documents for in camera review as a means of checking the accuracy of the

CIA's Vaughn declarations and the validity of its claims regarding the absence of

segregable nonexempt portions.  Plaintiffs would propose to limit this sample to 20

documents, thus greatly limited the burden placed on the court.  The documents selected

would include representatives of all of the exemptions claimed.

The conclusory nature of the CIA's affidavits is very clear.  With respect to

Exemption 1 claims, for example, the CIA does little if anything more than assert that

disclosure will harm the national security.  Thus, this factor obviously weighs in favor of

in camera inspection.

The third factor, bad faith, is also present, particularly with respect to the issue regarding the fees allegedly incurred in the Hall I litigation and the search for records responsive to Item 6. Thus, this factor, too, favors in camera inspection.

The fourth factor also favors in camera inspection. There are disputes over the extent to which multiple different exemption claims cover the same, or different, information, disputes over whether Exemption 2 information is "trivial" administrative data, and whether Exemption 5 material is properly exempt under a privilege or the privilege either does not apply or has been waived.

While the fifth factor does not apply, the sixth, public interest is very strong given the congressional and news media interest in the records and the massive withholding of information that is three or four decades old and no longer appears to present the national security risks involved at the time of the Vietnam War.

In view of these considerations, the Court should permit plaintiffs to select a small number of documents for further testing through in camera inspection.

C. Appointment of a Special Master

Given the considerations set forth above, this Court should consider using its discretion to conduct in camera review of a selected sample of the records that remain withheld in full or in part in this case. The circumstances present here fully warrant this action in compliance with the standards set forth m. Allen v. C.LA,, 636 .F.2d 1287,1294-1300 (D.C.Cir. 1980). The Court should also consider exercising its discretion to appoint a Special Master along the lines set forth in In Re U.S. Dent of Defense. 848 F.2d 232 (D.C.Cir. 1988)(per curiam),

42

Respectfully submitted,

JAMES H. LESAR  Bar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921
        (301) 328-5920
jhlesar@gmail.com

Counsel for Plaintiffs
Roger Hall and SSR, Inc.

42

## CONCLUSION

For the reasons set forth above, this Court should grant plaintiffs' Secong

Renewed Cross-Motion for Summary Judgment and Other Relief and deny defendant's

Second Renewed Motion for Summary Judgment.  The Court should permit plaintiffs to

take discovery and should order in camera inspection of certain records and/or appoint a

special master.

Respectfully submitted,

JAMES H. LESAR  Bar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921
          (301) 328-5920
jhlesar@gmail.com

Counsel for Plaintiffs
Roger Hall and SSR, Inc.