**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| ROGER HALL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 04-814 (RCL) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |

---

## MEMORANDUM OPINION

### I.    <u>Background</u>

Although this case is not breaking any records at merely thirteen years old, *Cf. DiBacco v. U.S. Army*, 795 F.3d 178 (D.C. Cir. 2015) (FOIA litigation lasting more than thirty years), this matter will continue to live on past today's decision.

Plaintiffs Roger Hall ("Hall"), Studies Solutions Results, Inc. ("SSRI"), and Accuracy in Media ("AIM") filed this action against defendant Central Intelligence Agency ("CIA" or "agency") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking records concerning prisoners of war and Service-members missing in action from the Vietnam War era. Before the Court is the CIA's renewed motion for summary judgment and plaintiffs' cross-motions for summary judgment, as well as plaintiffs' request for discovery, *in camera* review, and appointment of a special master. Upon consideration of the motions, the oppositions and responses thereto, the associated replies, the attachments and affidavits filed in support of each party's arguments; and the entire record of this case; the Court grants in-part and denies-in part the parties' motions. The Court explains its reasoning in the analysis below.

In February 2003, Hall made a FOIA request to the CIA on behalf of himself, SSRI, and AIM, seeking assorted records pertaining to POW/MIAs from the Vietnam War era. Hall Amd. Compl. [45] ¶ 6. Having received no substantive response, Hall and AIM filed this action in May, 2004. The procedural history of this case, leading up to November 12, 2009, is set forth comprehensively in Judge Kennedy's 2009 Order. *Hall v. CIA,* 668 F.Supp.2d 172, 175-78 (D.D.C.2009). Likewise, the subsequent history up through August 3, 2012 is provided in an Opinion by this Court issued on that date. 881 F.Supp.2d 38, 50 (D.D.C. 2012).

In its 2012 opinion, this Court ruled that the following issues remained outstanding: 1) the adequacy of the search with respect to Item 5 of plaintiffs' request; 2) the adequacy of the search with respect to Item 7 of the plaintiffs' request; 3) the disposition of referred documents with respect to Item 5; and 4) the agency's application of Exemptions 3 and 6 on the already produced documents.

This most recent round of litigation was kicked off by the CIA's renewed motion for summary judgment. [248] It is the CIA's position that it has resolved the outstanding issues related to production, and all that remains to be decided by the Court is the adequacy of the searches with respect to Items 5 and 7. *See* [248] at *3 ¶ 1. Item 5 of Hall's request included all records relating to a) 47 individuals alleged to be Vietnam-era POW/MIAs, whose next-of-kin have provided privacy waivers to Roger Hall, and b) 1,711 persons on the Prisoner of War/Missing Personnel Office's list of persons whose primary next-of-kin (PNOK) have authorized the release of information concerning them. Item 7 requests "[a]ll records on or pertaining to any search conducted regarding any other requests for records pertaining to Vietnam War POW/MIAs, including any search for such records conducted in response to any request by any congressional committee or executive branch agency." Specifics as to the status of production for each of these

requests will be addressed in the analysis below. So, too, is the plaintiffs' contention that CIA's production and conduct up to now leaves outstanding the other matters specified in the Court's 2012 order (the Item 5 referral documents, and application of Exemptions 3 and 6) and the adequacy of the *Vaughn* indices produced pursuant to that Order. For now, it will suffice to say that plaintiffs are so underwhelmed with the agency's progress that they are requesting discovery, *in camera* review of unredacted documents, and/or the appointment of a special master.

## II.     Legal Standards

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(a). It is "appropriate only in circumstances where 'the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.'" *Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must view all evidence "in the light most favorable to the nonmoving party" and, if a genuine dispute exists, "parties should be given the opportunity to present direct evidence and cross-examine the evidence of their opponents in an adversarial setting." *Id.*

As applied in a FOIA case, an agency defendant may be entitled to summary judgment if it demonstrates that 1) no material facts are in dispute, 2) it has conducted an adequate search for responsive records, and 3) each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure. *Miller v. U.S. Dep't of Justice*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (*citing Weisberg v. DOJ*, 627 F.2d 365, 368 (D.C. Cir. 1980)).

B. Adequacy of a Search

When an agency receives a FOIA request it is obligated to "conduct a search reasonably calculated to uncover all relevant documents," *Truitt v. Dep't of State*, 897 F.2d 540, 541 (D.C. Cir. 1990) (internal quotation marks omitted), among those sources of information not otherwise exempted by law. *See, e.g.*, 50 U.S.C. § 3141. The adequacy of a search, therefore, depends not on "whether any further documents might conceivably exist," *id.*, but on the search's design and scope. An agency must accordingly show that it made "a good faith effort to conduct a search for the requested records, using methods [that] can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).[1] An agency need not, however, "search every record system," or conduct a perfect search. *See id.*; *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

At the summary judgment stage, the agency bears the burden of showing that it complied with FOIA and it may meet this burden "by providing 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003). The plaintiff may then "provide 'countervailing evidence' as to the adequacy of the agency's search." *Id.* at 314. If a review of the record created by these affidavits

---

[1] In various filings and supporting declarations, the CIA and its affiants frequently repeat that the Court's earlier holdings about the CIA's searches being inadequate are "because . . .the CIA had erroneously stated that it had searched the systems 'most likely' to contain responsive documents rather than 'all systems that are likely to produce responsive records." To the extent the CIA is implying that the Court in its 2012 Order accepted the CIA's subsequent assertion that the CIA had "erroneously" stated where it searched, the Court rejects such a characterization. Giving the CIA the benefit of the doubt, its repeated invocation of erroneousness refers to its own legally significant error; the Court did not then and does not now treat the CIA's prior representations as merely a (repeated) rhetorical slip. In fact, the word "erroneous" appears nowhere in the Court's 2012 opinion. The CIA's decision to "reconsider the matter" of where responsive records are likely to be found, *see* [248-1] at *8; [248-2] at *9, implicitly acknowledges this to be so.

4

"raises substantial doubt," as to a search's adequacy, "particularly in view of 'well defined requests and positive indications of overlooked materials.'" summary judgment would not be appropriate. *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (quoting *Founding Church of Scientology v. Nat'l. Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979)).

"Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard*, 926 F.2d at 1200. They may, however, be rebutted by evidence of bad faith. *Id.*

### C. Production and Exemptions

This Court determines *de novo* whether an agency has properly withheld information under a claimed FOIA exemption. *See Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). "The underlying facts are viewed in the light most favorable to the [FOIA] requester," *Weisberg,* 705 F.2d at 1350, and the exemptions must be narrowly construed. *FBI v. Abramson,* 456 U.S. 615, 630, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). An agency claiming an exemption to FOIA bears the burden of establishing that the exemption applies. *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979). And FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C.A. § 552(b).

Especially in national security matters, however, courts generally defer to agency expertise. *See, e.g., Taylor v. Dep't of the Army,* 684 F.2d 99, 109 (D.C. Cir. 1982) (according "utmost deference" to classification affidavits); *Krikorian v. Dep't of State,* 984 F.2d 461, 464–65 (D.C. Cir. 1993) (acknowledging "unique insights" of executive agencies responsible for national defense and foreign relations). Because of that deference and the peculiarities of FOIA litigation,

agencies regularly submit affidavits setting forth the bases for withholding otherwise responsive information, just as they do to establish the adequacy of their searches, in support of their motions for summary judgment. These submissions usually also include so-called *Vaughn* indeces. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973). The agency's submissions "must show, with reasonable specificity, why the documents fall within the exemption." *Judicial Watch, Inc. v. U.S. Dep't of Health & Human Servs.,* 27 F. Supp. 2d 240, 242 (D.D.C. 1998). Again, they are presumed to be submitted in good faith. *Ground Saucer Watch, Inc. v. CIA,* 692 F.2d 770, 771 (D.C. Cir. 1981). The D.C. Circuit has explained the importance of these submissions in evaluating FOIA exemption claims:

> As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected. . . . . Affidavits submitted by a governmental agency in justification for its exemption claims must therefore strive to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation. The detailed public index which in *Vaughn* we required of withholding agencies is intended to do just that: to permit adequate adversary testing of the agency's claimed right to an exemption, and enable the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal.

*King v. U.S. Dep't of Justice,* 830 F.2d 210, 218–19 (D.C. Cir. 1987) (quotations omitted).

To accomplish that goal, the agency must supply "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent.,* 566 F.2d at 251. The requisite specificity "imposes on the agency the burden of demonstrating applicability of the exemptions invoked *as to each document or segment withheld.*" *King,* 830 F.2d at 224 (emphasis original). Though the affidavits need not contain factual descriptions the

public disclosure of which would endanger the agency's mission, *Vaughn,* 484 F.2d at 826–27, they must feature "the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a de novo review." *Church of Scientology of Cal., Inc. v. Turner,* 662 F.2d 784, 786 (D.C. Cir. 1980).

### a. Exemption 1

Exemption 1 protects matters that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1). Pursuant to Executive Order 13526, 75 Fed.Reg. 707 (Jan. 5, 2010), information may be classified only if all of the following conditions are met:

(1) an original classification authority is classifying the information;
(2) the information is owned by, produced by or for, or is under the control of the United States Government;
(3) the information falls within one of more [specified categories];[2] and
(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13526 § 1.1(a). The phrase "damage to the national security" means "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." Exec. Order. No. 13526 § 6.1(l). *See also Military*

---

[2] The Executive Order limits the government's ability to classify information to that which falls within the following enumerated categories: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or (h) the development, production, or use of weapons of mass destruction. Exec. Order No. 13526 § 1.4.

*Audit Project v. Casey*, 656 F.2d 724, 748 (D.C. Cir. 1981) (deferring to agency affidavits as to the proper classification of information).

### b. Exemption 3

Exemption 3 covers records that are specifically exempted from disclosure by statute under conditions dictated by the FOIA. 5 U.S.C. § 552(b)(3). Certain provisions of the Central Intelligence Agency Act and the National Security Act that require the protection from unauthorized disclosure of intelligence sources and methods, and certain information regarding the organization and personnel of the CIA, are such statutes. *See* 50 U.S.C. §§ 3024, 3507. In cases involving national security equities, such as this one, there is therefore generally significant overlap between the information covered by Exemption 1 and that covered by Exemption 3. *See also Military Audit Project*, 656 F.2d at 737 n. 39 (citing *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)). With respect to Exemption 3 claims, as with the other exemptions, this Court seeks to balance the inherent tension between the public's interest in government goings-on with the protection of an agency's legitimate, and statutorily recognized need for secrecy in certain matters. *See Miller*, 872 F. Supp. 2d at 22.

### c. Exemption 5

FOIA Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).[3] As relevant here, Exemption 5 has been applied as an exercise of the

---

[3] Plaintiffs argue that the Court should apply in this case the FOIA Improvement Act of 2016's sunset provision to deliberative process privilege claims. That statute states that the privilege, "shall not apply to records created 25 years or more before the date on which the records were requested." 5 USC § 552(b)(5) (2016). According to its *Vaughn* indices, the CIA has claimed Exemption 5 with respect to 20 documents -- three that were released-in-part, and seventeen that were denied-in-full. Only one document is denied-in-full solely on the basis of Exemption 5; it is undated, but apparently bears hallmarks as to its age.

The Senate report accompanying the legislation explains, in part:

deliberative process privilege. *See* Shiner decl. [248-2] at ¶ 61.[4]  "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).  Three policy bases underlie this privilege:

> First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.  Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon.  And third, it protects the integrity of the decision-making process itself by confirming that "officials should be judged by what they decided[,] not for matters they considered before making up their minds."

*Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772–73 (D.C. Cir. 1978)).  Therefore, Exemption 5 "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." *Id.* at 1048.

For material to qualify for withholding or redaction under Exemption 5, it "must be both 'predecisional' and part of the 'deliberative process.'" *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 339 (D.C. Cir. 2011) (internal quotation marks omitted).  A document

---

> The [sunset] provision ensures government records be made available to the public for their educational and historic value, while providing sufficient time for agencies to protect against the disclosure of their deliberative processes.  The world can change significantly over the span of 25 years, and the public benefits derived from access to historical records should continue to be given special consideration when weighted against the government's interest in withholding information.. . . . The amendment to Exemption 5 is consistent with the unique relationship that government employees have with executive branch agencies, as well as the duty imposed on government employees to act in the public interest. . . .

S. REP. No. 114-4 (2016).

The Act, however, also provides that its amendments to the FOIA "shall apply to any request for records . . . made after the date of enactment of this Act."  Thus, the only way for the Act to be applicable to the present litigation is if the plaintiff's filings after the date of enactment (June 30, 2016) can properly be construed as FOIA requests in and of themselves; if so, that would materially alter the CIA's ability to apply Exemption 5 to materials produced pursuant to those requests.  The plaintiffs have not alleged they have sent a FOIA request to the CIA after June 30, 2016, and the Court declines to treat its filings as such; a motion for summary judgment is a motion to a court, not a request to an agency.  The Court therefore applies Exemption 5 as codified prior to the enactment of the FOIA Improvement Act.

[4] CIA's claims of material covered by the attorney-client and work product privileges were disposed of in the Court's 2012 order.  881 F.Supp.2d at 69-70.

9

is predecisional if it is prepared "to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (internal citations and quotation marks omitted). A document is predecisional only if a court can "pinpoint an agency decision or policy to which the document contributed." *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). If that document is, in fact, later adopted as an agency decision, however, it may lose it 'predecisional' status. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Furthermore, although draft documents may properly be withheld under Exemption 5, an agency's mere "designation of a document as a 'draft' does not automatically trigger proper withholding under Exemption 5." *Defs. Of Wildlife v. U.S. Dep't of Agric.*, 311 F. Supp.2d 44, 58 (D.D.C. 2004).

A document is part of the deliberative process "if the disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Formaldehyde Inst.*, 889 F.2d at 1122 (internal quotation marks omitted). In addition, "[f]actual material is not protected under the deliberative process privilege unless it is 'inextricably intertwined' with the deliberative material." *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 372 (D.C. Cir. 2005).

## d. Exemption 6

Exemption 6 protects disclosure under the FOIA of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C § 552(b)(6). Exemption 6 thus has two prongs, and requires an agency to prove both the nature of the files and that the files' disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Dep't of State v. Washington Post Co.,* 456 U.S. 595, 599-603, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982)). The first criterion does not require that the information be contained in a specifically designated "personnel" file. *Id.* at 601. It is met if the information "appl[ies] to a particular individual" and is "personal" in nature. *New York Times Co. v. NASA,* 852 F.2d 602, 606 (D.C. Cir. 1988). The second step of an Exemption 6 analysis is to strike a "balance between the protection of an individual's right to privacy and the preservation of the public's right to government information." *Washington Post Co.,* 456 U.S. at 599. The "public interest" in the analysis is limited to the "core purpose" for which Congress enacted the FOIA, i.e., to "shed ... light on an agency's performance of its statutory duties." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

Information about federal employees therefore generally does not qualify for protection. *See Arieff v. Dep't of the Navy,* 712 F.2d 1462, 1467–68 (D.C. Cir. 1983) (declining to protect information about a large group of individuals); *Aguirre v. SEC,* 551 F.Supp.2d 33, 54 (D.D.C. 2008) ("Correspondence does not become personal solely because it identifies government employees."). There must be some personal information that relates to a particular individual for exemption 6 protection to be warranted. Typical personal information protected under exemption 6 includes "place of birth, date of birth, date of marriage, employment history, and comparable

data." *Nat'l Ass'n of Retired Fed. Emps. v. Horner,* 879 F.2d 873, 875 (D.C. Cir. 1989). In examining an exemption 6 withholding, the court must balance the privacy interest at stake against the public's interest in disclosure. *Fund for Constitutional Gov't v. National Archives and Records Serv.,* 656 F.2d 856, 862 (D.C. Cir. 1981). "Under exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26, 32 (D.C. Cir. 2002).

## III.    Analysis

Over the years of this litigation, Hall's FOIA request has resulted in the release of more than 4,000 documents tending to shed light on the fates of prisoners of war and those men otherwise reported as missing in action during the Vietnam conflict. *See Hall v. CIA,* 115 F.Supp.3d 24, 29 (D.D.C. 2015). Since the Court's 2012 order alone, the CIA has processed and released (in-full or in-part) over 750 additional responsive documents. Shiner decl. ¶ 29. The years of back-and-forth in this litigation, characterized by numerous motions, cross-motions and oppositions, as well as declarations and iterative supplements thereto, tends to obscure that the Court's two-fold task here is theoretically fairly straightforward: to determine the reasonableness of the CIA's search for and production of documents responsive to plaintiffs' 2003 FOIA request. Although we are getting closer to a final resolution, the Court finds some daylight remains to be shed on both prongs of this judicial inquiry.

### A. Adequacy of the Search(es)

The "genuine issue of fact" relevant to a FOIA summary judgment motion is not the existence of any particular document, but rather the reasonableness of the agency's search. *See SafeCard,* 926 F.2d at 1201. The question before the Court therefore is not whether there were or

are still American POWs remaining in Southeast Asia contrary to the government's representations, but whether the searches conducted by the CIA (of its non-exempted files) pursuant to the plaintiffs' FOIA request were adequately likely to yield information related to that request.

The court may rely on an agency's "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby,* 920 F.2d at 68. Such affidavits are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents," so long as they are "relatively detailed and non-conclusory." *Mobley v. C.I.A.,* 806 F.3d 568, 580–81 (D.C. Cir. 2015), quoting *SafeCard,* 926 F.2d at 1200. The plaintiff "may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Morley v. C.I.A.,* 508 F.3d 1108, 1116 (D.C. Cir. 2007) (quoting *Founding Church of Scientology,* 610 F.2d at 836).

Here the CIA has submitted declarations from a senior Information Review Officer with original classification authority. Shiner decl. at ¶¶ 1-6; 2d Shiner decl. [272-1]. The declarations describe in great detail the process the CIA has used to search for documents responsive to Items 5 and 7 of plaintiffs' request. Plaintiffs continue to challenge the adequacy of the CIA's searches in this case, using several declarations of their own, complete with numerous exhibits culled from previously disclosed records and other research.

     *a. Item 5*

Plaintiffs' Item 5 requests records on over 1,700 persons reported to be prisoners of war or missing-in-action during the Vietnam War. The CIA's declarant details what systems were

searched for records responsive to this request, and how (*i.e.*, which search terms were used). Shiner decl ¶ 22. It details how the agency's search team "manually reviewed" hard-copy folders, "page-by-page, to determine responsiveness," and explained the criteria used to determine what would be considered responsive. *Id.* It likewise describes the agency's searches of its CADRE system ordered by this Court. *Id.* at ¶ 24.

But the CIA's affidavits are insufficient in certain critical ways. Its declarant states that 114 folders out of the 569 originally identified as potentially responsive "had been properly destroyed in accordance with the CIA's records control schedule." *Id.* at ¶ 22. Plaintiffs argue that the CIA "should describe, with particularity" what schedules the agency is referring to that would allow it discretion to destroy records on reported missing persons. *See* [289] at *29. The Court agrees with the plaintiffs, finding the conclusory assertion that the folders were "properly" destroyed as undermining what otherwise appears to be an adequate search of the sources of files it searched. The Court therefore directs the CIA to provide further specificity as to the regulations and schedules applied to its decision to destroy the files.

Furthermore, although a search may be adequate despite failing to discover "an entire category of records . . . that, according to the requester, was of such importance that records must have been created, *Mobley,* 806 F.3d at 583 (quoting *DiBacco,* 795 F.3d at 190), a search is inadequate when it is "evident from the agency's disclosed records that a search of another of its records system might uncover the documents sought." *Valencia-Lucena*, 180 F.3d at 326. While the plaintiffs have littered the record with plenty of speculation that, to paraphrase, insists more records must exist because so many men have been reported missing, they also have pointed to several concrete examples of categories of documents that prior productions strongly suggest do exist. *See, e.g.,* Hall decl. [260].

The CIA has thus far failed to address specific allegations of inadequacy with any particularity, except to reiterate that it has produced the non-exempt material in the places it has searched. For example, in addition to the CIA's failure to turn-up files on 1,700 of the names of reported missing persons that it searched for, plaintiffs present evidence of imagery of suspected prison camps, up to 1,400 live-sighting reports, and named reconnaissance and rescue operations alleged to have taken place. Although specific imagery, intelligence reports, and operations, even those more than 60 years old, may well still be classified, the Court cannot be left to speculate about whether such records, if they exist, are among those the CIA Director has designated as operational files pursuant to his statutory authority. *See* Def. Reply and Opposit'n [272] at *12 (representing that plaintiffs "have identified only the [a]gency's operational files" in their argument that the CIA's search has been inadequate). And, although the Court is strongly inclined to defer to the CIA's determinations as to classification and Section 3141, the present record fails to demonstrate how such dated records can reasonably be considered operational under the statute. In this particular litigation, that the CIA conducted a decennial review of its operational files in 2015, 2d Shiner decl. at ¶¶ 17-20, is a threshold matter; it is not the end of the inquiry before the Court.

### b. *Item 7*

Plaintiffs' Item 7 requests, "All records on or pertaining to any search conducted regarding any other requests for records pertaining to Vietnam War POW/MIAs, including any search for such records conducted in response to any request by any congressional committee or executive branch agency." As with respect to Item 5, the CIA's submissions detail how it went about its search for materials responsive to Item 7. It describes its determination as to the offices likely to

contain responsive records sent to Congress, and the universe of terms searched. Shiner decl. ¶ 26. It also explains in detail the CIA's follow-up with respect to certain attachments, enclosures, photographs, and reports of previously produced documents, as ordered by the Court in 2012. Shiner decl. ¶ 28.

As an initial matter, to the extent the plaintiffs now wish to expand the search terms used, *see* AIM MSJ [258] at **15-16; [286] at **7-8, the Court denies their request. First, the search terms used were reasonably calculated to discover the information in plaintiffs' request. Second, the paucity of responsive records itself does not determine whether the search was adequate. Third, the Court is skeptical of plaintiffs' argument that additional searches for the names of specific POW camps or the codenames of reconnaissance operations is likely to yield further responsive records; it is reasonable to accept that (at least most) such records would simultaneously include the terms already searched. At this stage, the Court will not order the CIA to commit its limited resources to searching anew for what is unlikely to yield new responsive materials. *See also Mobley*, 806 F.3d at 583 (failure to discover an entire category of records did not render a search inadequate).

Further, plaintiffs' reliance on a number of affidavits submitted by former congressmen and senators, combined with insistence that "the CIA must search its operational files," [258] at *10, seems to imply a belief any documents that the CIA may have shared with Congress out of the agency's properly-designated operational files now must be disclosed pursuant to FOIA. That notion is incorrect. Whether compelled or voluntary, the CIA's decision to share its operational information with other government agencies or with Congress, does not sacrifice that information's protection from disclosure under FOIA. The applicable statute does not envision that outcome, 50 U.S.C. § 3141, and to decide otherwise would likely chill both interagency

cooperation and Congress' oversight function. *See also Military Audit Project*, 656 F.2d at 753-54 ("It would be unwise for us to punish flexibility, lest we provide the motivation for intransigence.").

This item, however, is essentially a request for records about prior searches for records. So although the CIA need not disclose to FOIA plaintiffs information from its operational files, the fact that it may have previously disclosed information from its operational files or elsewhere pursuant to the requests of congressional committees is itself within the scope of the FOIA request. For example, the plaintiffs submitted affidavits from certain former congressmen and senators that make it abundantly clear to the Court that, at some point, these individuals were shown imagery of possible POW camps that plaintiffs say has not been produced to them. The CIA has not addressed why that might be. To be clear, as with Item 5, what is troublesome is not necessarily *that* the CIA has not produced in this litigation certain information that may be exempted from disclosure, but that the CIA has failed to squarely address plaintiffs' evidence strongly indicating that the agency does possess the information sought. If the agency cannot confirm or deny the existence of that information in a public filing, so be it, but its inadequate responses thus far makes it impossible for the Court to grant the CIA's motion for summary judgment as to its searches.

B. Production

a. *Disposition of Referral Documents Since 2012*

In its 2012 ruling, the Court ordered the CIA to follow-up on the seven documents responsive to Item 5 that had been referred to other agencies for review, but whose disposition had not yet been determined. The CIA considers the issue to be resolved. Shiner decl. at ¶ 16. Plaintiffs, in their oppositions and cross-motions, disagreed, arguing the NSA's response is

insufficient. [259] at **34-36. The CIA subsequently further explained the processing of the document in-question, and the basis for its asserting that the matter is resolved. 2d Shiner decl. at ¶ 16. Plaintiffs do not appear to challenge this more complete account, and the Court agrees with the CIA that this matter is resolved.

### b. *Applications of Exemptions Rejected in 2012*

In its 2012 order, this Court determined that questions remained related to the CIA's invoking Exemptions 3 and 6 for names and photographs on certain produced documents. 881 F.Supp.2d at 67, 71-72. With respect to Exemption 3 on the documents then in-question, the Court finds the CIA has adequately addressed the Court's concern with its submissions filed shortly after entry of the order. *See* Tisdale decl. [188-2] at ¶ 3(b).

With respect to Exemption 6, the Court determined in 2012 that "the CIA has not overcome the heavy presumption in favor of disclosure found in exemption 6 in regard to the names" contained in the already produced documents, as "the names . . . themselves appear to be the subject of substantial public interest." 881 F.Supp.2d at 71. The Court observes that the public interest in POW/MIA issues has not waned in the past five years – indeed, the POW/MIA flag flew just below our nation's flag over the dome of the Capitol on Independence Day just last month, and a Sunday edition of the Washington Post that same week featured a front-page story on a Vietnam Veteran who had been missing in action and presumed dead.[5] The Court reiterates its holding that the public interest in this matter is high, and the CIA's speculation about potential "harassment, intimidation, or unwanted contact," 2d Shiner decl. at ¶ 14, does not overcome the strong presumption of disclosure. See *Nat'l Ass'n of Home Builders,* 309 F.3d at 32 ("Under

---

[5] Michael E. Ruane, *Marked Dead in Vietnam, a Long Journey Back to Life*, Wash. Post (July 9, 2017) at A1.

exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the [FOIA]."); *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 875 (declining to include individuals' names among the types of information normally withheld under Exemption 6). Although the Court understands the government's interest in protecting lower-level employees, 2d Shiner decl. at ¶ 14, or at least persons who were lower-level employees at the time of the relevant document's creation, the weight of that interest fades considerably as decades pass. Therefore, as to the non-CIA employees' names redacted under Exemption 6, the Court once again denies summary judgment to the CIA and grants summary judgment to plaintiffs.

### c. Post-2012 Document Release and Accompanying Vaughn Indices

Since its 2012 order, the CIA has released an additional 750 documents in whole or in-part that are responsive to the plaintiffs' request. For the responsive documents located for which release was denied in full, and for those documents released-in-part that plaintiffs selected for a sample *Vaughn* index, the CIA asserted various combinations of Exemptions 1, 3, 5, and 6.

It is clear to the Court that the CIA has sufficiently detailed its classification review and declassification analysis concerning its applications of Exemption 1. Shiner decl. at ¶ 34-56; 2d Shiner decl. at ¶11. It has described in great detail the conditions under which information is properly classified, and how it has determined the continued applicability of those conditions to the relevant responsive documents in this case. It also has articulated the standards by which classification determinations are reviewed for the downgrading and eventual public release of information, and why certain information in the documents now at issue cannot be yet be released.

However, the CIA's Denied-in-Full *Vaughn* index, [248-2] at **70-96, lists three undated documents that cite to Exemption 1 (documents 2, 3, and 15). Because the CIA's declassification

standard of review is, in part, a function of the age of the documents, the CIA must discern and disclose the latest date on which these document can reasonably be considered to have been created. This date should be indicated by a designation such as "no later than," "NLT," or similar, and should be based on hallmarks of the age of the document, determined first by looking at the features and content of the document itself (*e.g.*, comparing the name and position of the author and recipient to the times during which those persons held the positions they were in at the time, or observations of then-current events), and then, if the document itself somehow bears no such hallmarks as to its age, by looking to the context in which the document was found (*e.g.*, whether documents stored alongside the one in question are themselves dated or bear hallmarks as to their age which the document in question does not).[6]

Regarding Exemption 3, the CIA has explained its grounds for withholding information based on provisions of the Central Intelligence Agency Act and the National Security Act. As to the former, plaintiffs argue that a plain reading of the CIA Act's exemption of information concerning "personnel employed by the Agency," 50 U.S.C. § 3507, is limited to current employees, and that it certainly cannot be applied to deceased former employees. [286] at **13-14. The Court disagrees. No profound logical stretch is necessary to read that language as encompassing persons currently or previously employed by the CIA, especially when considering the text and purpose of the statute as a whole. At the extreme, plaintiffs' preferred interpretation would suggest that there is no Exemption 3 protection even over the names of officers killed in a recent covert operation. That reading would be profoundly likely to cause damage to the national security of the United States of exactly the sort that the CIA Act is meant to prevent.

---

[6] The Court notes that, prospectively, the CIA's ability to rely on Exemption 5 is also going to depend on the age of the documents in question. *See* n. 3, *supra.* Here, undated denied-in-full documents citing to (b)(5) include documents 2, 14, and 35. The Court believes that the same diligence can and should be applied to those documents.

As for the CIA's exercise of Exemption 3 under the NSA Act, 50 U.S.C. § 3024, one of the plaintiffs argues:

> some intelligence sources and methods are so commonly known by the news media, the public at large, and hostile intelligence agencies that it is generally pointless to protect them in the name of national security, particularly when there have been vast disclosures related to the topic by congressional committees and the press.

[286] at *15; [259] at **23-24. That argument has been roundly and consistently rejected. *See, e.g., Military Audit Project*, 656 F.2d at 741-45, 752-53 (press reports and published congressional studies concerning a national security operation have no bearing on whether that operation is properly classified). The relative successes or failures at protecting intelligence sources and methods does not impact the continuing statutory duty to do so. *See id.* at 745 (musing that the details of a sensitive operation may one day be disclosed "when the story is safe to tell.").

Regarding the CIA's application of Exemption 5, noting that a future FOIA request for the information the CIA has redacted pursuant to this exemption would likely be subject to the sunset provision in the amended statute, the Court finds the CIA has met its burden under the pre-FOIA Improvement Act standard. The CIA's affidavits and accompanying *Vaughn* indices adequately establish the context for properly applying the deliberative process privilege, and also attest to the non-segregable nature of the information underlying the redactions.[7] The plaintiffs allege that extensive government misconduct vitiates the privilege asserted here; the Court disagrees. It is extremely unlikely that deliberate and wanton misconduct on the scale suggested by plaintiffs

---

[7] The plaintiffs' reliance on *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Homeland Sec.*, 648 F.Supp.2d 152 (D.D.C. 2009), for the proposition that information such as specific documents' authors or recipients is necessary to perform a proper analysis under Exemption 5, is misplaced. *See* [259] at **11-12. Although each FOIA exemption must generally be analyzed on its own merit, the plaintiffs cannot use Exemption 5 to get around the statutory protections against disclosure of information related to the CIA's personnel and organization that happen also to be grounds for some of its Exemption 3 assertions. There is simply no analogy here to the cited case's treatment of the United States Customs and Border Patrol documents.

exists to the extent that the Court would find the privilege inapplicable. Plaintiffs' conspiracy theory would require the complicity of eight presidential administrations of both parties, dozens of congressmen and senators (including Vietnam veterans), and hundreds of other public servants. Though the CIA is not an unblemished agency, and the government as a whole is not without its share of poorly considered or executed policies, the Court will not pierce the veil of the government's privilege here.

Finally, the Court denies the CIA's motion for summary judgment as to Exemption 6. The CIA's speculation that disclosure of certain names in decades-old documents might bring "unwanted attention from the media . . . especially in the social media age," Shiner decl. at ¶ 65, is insufficient to overcome the strong presumption favoring disclosure. *See Nat'l Ass'n of Home Builders*, 309 F.3d at 32. The CIA shall therefore reexamine its application of Exemption 6 in accordance with the Court's analysis and direction in section III(B)(b) of this opinion.

## C. Plaintiffs' Additional Requests

### a. Discovery

"Discovery is not favored in lawsuits under the FOIA. Instead, when an agency's affidavits or declarations are deficient regarding the adequacy of its search ... the courts generally will request that the agency supplement its supporting declarations." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 185 F.Supp.2d 54, 65 (D.D.C. 2002) (citing *Nation Magazine, Wash. Bureau v. U.S. Customs Service*, 71 F.3d 885, 892 (D.C. Cir. 1995); *Oglesby*, 920 F.2d at 68). Courts may permit discovery in FOIA cases where a "plaintiff has made a sufficient showing that the agency acted in bad faith." *Voinche v. FBI*, 412 F.Supp.2d 60, 71 (D.D.C. 2006) (citing *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).

In each of the several previous instances where plaintiffs have alleged bad faith in this matter, both this Court and Judge Kennedy earlier have not found that to be so. 668 F.Supp.2d at 196 (2009 order); 881 F.Supp.2d at 74-75 (2012 order). Likewise here, though its conduct in this litigation has at times been unreasonable, *see* 115 F.Supp.3d at 30-31 (2015 order), the CIA has not acted so badly as to merit discovery at this stage.

        *b.* In camera *Review*

FOIA gives district courts the discretion to examine the contents of requested agency records *in camera* "to determine whether such records or any part thereof shall be withheld." *See* 5 U.S.C. § 552(a)(4)(B). "The decision whether to perform *in camera* inspection is left to the 'broad discretion of the trial court judge.'" *Lam Lek Chong v. DEA,* 929 F.2d 729, 735 (D.C. Cir. 1991) (quoting *Carter v. U.S. Dep't of Commerce,* 830 F.2d 388, 392 (D.C. Cir. 1987)). Agency affidavits are sufficient to justify summary judgment without *in camera* inspection when they:

> must show, with reasonable specificity, why the documents fall within the exemption. . . . If the affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.

*Hayden v. Nat'l Sec. Agency,* 608 F.2d 1381, 1387 (D.C. Cir. 1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). "[W]hen the agency meets its burden [under FOIA] by means of affidavits, *in camera* review is neither necessary nor appropriate." *Weissman v. CIA,* 565 F.2d 692, 696–97 (D.C. Cir. 1977). However, "*in camera* inspection may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency," when the number of withheld documents is relatively small, or "when the dispute turns on the contents of

the withheld documents, and not the parties' interpretations of those documents." *Quinon v. FBI,* 86 F.3d 1222, 1228 (D.C. Cir. 1996).

While FOIA provides the Court the option to conduct *in camera* review, 5 U.S.C. § 552(a)(4)(B), it by no means compels the exercise of that option. *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 224, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). It is within the Court's "broad discretion" to decline to conduct *in camera* review where, as here, the Court determines that *in camera* inspection is unnecessary "to make a responsible de novo determination on the claims of exemption." *Carter,* 830 F.2d at 392.

The Court declines to order *in camera* review at this time. As already discussed above, the Court has been able to make reasoned judgments concerning the CIA's production based on the information already in the record, and is satisfied that any deficiencies in the CIA's production will be cured by its full compliance with the Court's present order.

### c. *Appointment of a Special Master*

Federal Rule of Procedure 53 vests district courts with discretion to appoint masters to, *inter alia,* "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. Pro. 53(a)(1)(C). Because the Court has already found that *in camera* review is unwarranted, the plaintiffs' motion to appoint a master is moot.

### IV.    Conclusion

For the foregoing reasons, each of the parties' motions for summary judgment, [248], [258], [259], is GRANTED-IN-PART and DENIED-IN-PART, in accordance with the order

accompanying this opinion, and the plaintiffs' motions for discovery, in camera inspection, and appointment of a special master are DENIED.

Date:  8/2/17

Royce C. Lamberth
United States District Judge